Opinion delivered June 22, 1886.

---

[No. 5102.]

L. W. OWENS *v.* THE STATE.

THEFT—INTENT—FACT CASE.—See the statement of the case for evidence *held* insufficient to support a conviction for theft of a horse because it fails to show the necessary fraudulent intent at the time of the taking; wherefore the trial court erred in refusing a new trial.

APPEAL from the District Court of Erath. Tried below before the Hon. T. L. Nugent.

The conviction in this case was for the theft of a horse, the property of W. H. Basey, in Erath county, Texas, on the tenth day of October, 1885. A term of twelve years in the penitentiary was the penalty imposed.

W. H. Basey was the first witness for the State. He testified that in the fall of 1884, and at the time of this trial, he lived at Hog Springs, in Erath county, Texas, about seven miles from Stephenville, and about three and a half miles from the defendant's house. In October of that year he owned three colts, viz.: a black mare colt, foaled in the spring of 1883; a bay mare colt, foaled in the summer of the same year, and a smutty iron gray mare colt, foaled in the spring of 1884. The two former run in a field during the winter of 1883–1884, and got their tails and manes filled with cockle burrs, and witness, assisted by Ned

Lankford, sheared their tails and cropped their manes, in order to remove the burrs. The three colts ran about the witness's house from the spring of 1884 until late in October of the same year, when they disappeared. Witness made diligent search for the animals as soon as he missed them, and gave written and verbal descriptions of them to a great many persons. Witness put a bell on the black colt, late in October, 1884, just before the animals were lost. Witness had never seen the black and iron gray colt since their disappearance. About the middle of October, 1885, a year after the colts disappeared, witness found his bay mare colt on the range, between his and the defendant's house. The cold then had the defendant's brand, LW, on it, but witness knew it to be his colt. The animal had been raised as a pet, and it willingly permitted witness to go up to it and put his arms around its neck. Witness then examined it closely, and found the still existing signs of the shears on its mane and tail. Witness then got Ned Lankford, who knew the colt as well as he did, and the two drove it to the witness's house. The witness then went to the defendant's house to see him about the matter. Not finding the defendant at home, he told his son Tommy to tell his father that he, witness, had got his colt, with his, defendant's brand on it, and that he wanted to see defendant about it. Tommy replied: "We did not mark the colt; that was done at old man Fair's." Witness retained possession of the colt in question until its death in March, 1886. The witness was absolutely certain that the colt in question was his animal. It was taken from his possession without his knowledge or consent. Mr. Bates was with witness when he found his colt with the defendant's brand on it.

Cross-examined, the witness testified that, after the indictment in this case was preferred, the defendant instituted a suit against him in the justice's court to try the right of property to this colt. After witness took the colt up, the defendant claimed it, and proposed to arbitrate the question of ownership with witness. Witness declined to arbitrate, simply because he knew positively that the colt was his. Witness, in shearing the tails of his colts, cut the hair up and down, across, and in every way, to get the cockle burrs out. He did not shave the tails smoothly, as mules' tails are ordinarily shaved. Witness gave written descriptions of his lost animals to Sam Jackson, Campbell, Gaither, B. M. Kiker, and others. J. G. Wofford was present when witness gave the written description to Jackson, and copied it. The writ-

ten descriptions were distributed long before witness found his bay colt. The civil suit in the justice's court, involving the ownership of this animal, had been pending five or six months at the time of this trial. Witness had always been ready for trial, and had never had the case continued.

Powers Morton testified, for the State, that he knew the defendant and the prosecuting witness Basey, and in 1884 lived with his father, in the same neighborhood in which they lived. On or about the first day of November, 1884, the witness saw, at his father's house, three mare colts. One was a black animal and had a bell on. Another was a bay, and the third was a smutty, mouse colored animal. Those animals were very gentle, and ranged about witness's father's place for several weeks. They were estrays. The manes and tails of the black and bay colts had been recently sheared. The smutty gray colt was a much younger animal than the other two. One evening, several weeks after they first came to the range, the black colt came up to witness's father's house without the bay and gray, and minus its bell. A few evenings later the bay and smutty gray came up with witness's father's stock, but the black was missing, and witness had never seen it since. The bay and gray colts then ranged about witness's father's house for several weeks, and disappeared. Witness next saw them in December, 1884, on Michael Fair's range. Witness saw them (the bay and gray colts) on the range between the houses of Fair and defendant off and on throughout the winter of 1884. Fair lived about one mile east of witness's father, and defendant about the same distance north east. Fair lived about a mile south east of defendant. The stock range of Fair and defendant was a common range. Their respective houses are in sight, only a few trees and a few mesquite bushes growing between them here and there. Witness often, during the time the colts were on the range of defendant and Fair, met the defendant and his son Jim riding over the range, looking after stock.

The witness first met the prosecuting witness Basey in the fall of 1885, when he inquired of witness about three colts he had lost. He said that he had recently recovered one of them, but had been unable to find or hear of the others. Witness gave him a description of the three colts which came to his father's house during the preceding winter, and ranged about that house for a while, and Basey said that they were his animals, and the ones for which he was hunting. Witness then went home with

Basey and examined the colt he had recovered, and witness was absolutely certain that that bay colt, then branded LW, was the bay colt which came with the black and the smutty gray colts to his father's house during the previous winter. Its mane and tail showed distinctly the traces of the shears, and in every respect it corresponded with the bay colt first described by the witness, except that it was now branded LW. Witness knew the mare "Old Mollie," which the defendant owned in 1885. Defendant's children, during the spring and summer of 1883, attended the same school at Center Grove that witness attended, and they rode "Old Mollie." "Old Mollie" then had a sucking colt following her, which was foaled in the spring of 1883. That colt was a light bay or sorrel horse colt. It had a blaze in its face, and a white snip on the nose. The bay mare colt described by witness, and claimed by Basey, had only a white spot in its forehead. Witness knew "Old Mollie" and her colt well. "Old Mollie's" colt disappeared in the summer of 1884, and witness had not seen it since, nor did he know, of his own knowledge, what became of it.

Some litttle time after this prosecution was instituted, the witness met the defendant in the town of Stephenviile. Defendant called witness into the back room of Cage's store, and said to the witness: "I understand that you have said you will swear on my trial that 'Old Mollie's' colt of 1883 was a horse colt, and that you helped to alter it?" Witness replied to defendant that he did not say that. Defendant replied: "I did not believe you would swear it. I have said that I would kill you before you left the country if you swore it. You may not believe that I would, but I am prepared to do it. I will shoot any man off the stand who swears it." Defendant was angry and in ill humor at the time of that interview. Witness denied that he had made the statement imputed to him by the defendant, because he did not want to have a difficulty with defendant, and besides he could truthfully deny it because he had not made the statement as the defendant repeated it. He had said that he would swear that "Old Mollie's" 1883 colt was a horse colt, but he had never said that he helped to alter it or that he would so swear. Witness now swears without qualification or reservation that "Old Mollie's" 1883 colt was a horse colt with a blazed face and a white snip on its nose, with perhaps some white feet.

Cross-examined, the witness testified that he was a son of preacher Marshall Morton. He could not swear positively that

"Old Mollie's" colt had any white feet, but he was absolutely certain that it was a horse colt with blazed face, and white snipped nose.

M. Fair testified, for the State, that in 1884, and at present, he had lived near the defendant's house, and about in the center of his, defendant's, stock range, which was also his, witness's, stock range. About the first of December, 1884, two stray mare colts, one about two years old, bay in color, with a white spot in its forehead, and the other a dirty, smutty mouse colored animal, of the previous spring's foal, came upon the common range of the witness and defendant, and ran with witness's horses until late in the winter, when the small smutty colored colt disappeared, and has never been seen by witness since. The mane and tail of the bay colt showed plainly the traces of shearing. That colt stayed about witness's place until about June 1, 1885, when the defendant came to witness's place and drove it off. During the time that the two colts ran on the range about the witness's house, the witness had three different conversations with the defendant about them. The first of these conversations occurred about the middle of the winter, or some time in January or February, 1885. Witness opened that conversation by saying to the defendant: "Those colts of yours now running with my horses ought to have some attention." Witness then supposed that defendant owned the colts, as Bud Kiker had told him that, judging from the description of the animals, he supposed they belonged to defendant. Replying to the witness, defendant said: "They are not my colts. I have no spring or yearling colts gone. I have a two year old gone, but it has a white streak down its face and a white spot on its nose." It was the recollection of the witness that defendant said, also, that that colt had a white foot or feet or white on its feet. Witness did not describe these colts to the defendant. He presumed that the defendant knew them as well as he did, as he had every opportunity to know them. They ran with defendant's stock as much as with the witness's, and as much about defendant's house as about the witness's. The spring colt disappeared shortly after that conversation.

The second conversation with defendant alluded to occurred about the last of April, 1885. Witness remarked to the defendant that he believed he would post that stray colt. Defendant replied that witness could not post it under nine months or a year, or until the colt had been on the range nine months or a

year.   Defendant said, also: "I don't know yet but that the colt
is mine."   Witness then said to him: "Mr. Owens, when I called
your attention to this colt, a while back, you said that your two
year old that was out had a white face and nose."   Defendant
replied:   "I have concluded that I was mistaken about that.   It
is another colt I was thinking of.   I would not know my colt,
and will have to get the boys to identify it.   I think they will
know 'Old Mollie's' colt."   Little was said at the third conversa-
tion, which occurred when the defendant came to take the colt.
He merely asked the witness to let him drive his, witness's, colts
along with it, as he could easier get it home by that means.   He
then spoke of other matters, changing the conversation from the
colt.   He was, in fact, noticeably silent about the colt on this
last occasion, saying nothing about the ownership or identifica-
tion of the animal.   Ten or twelve days after the defendant
drove the colt to his home from the range, it came back to the
range branded LW, which was the defendant's brand.   The
winter of 1883–1884 was a very severe one on stock, and the de-
fendant rode a great deal over the range, sometimes with the
witness, attending to his needy stock.   The description given
witness by the defendant of the colt he lost, at the first conver-
sation, did not suit the colt he afterwards drove home from wit-
ness's house, and which afterwards came back to the range in
his brand.   The colt taken up by Basey afterwards was the iden-
tical colt the defendant drove away from the witness's house.
Witness testified, on the trial of the right of property to this colt,
between defendant and Basey.   After that trial, defendant, who
found fault with the witness's testimony, said to witness:   "You
would not have lived to have said many more words."   He was
then angry and spoke fiercely.   At that time defendant owned
twelve or fifteen head of horses and several head of cattle.

Cross-examined, the witness testified that he was not trying to
"get away with the colt" himself.   The colt had no notch in its
ear when it first came to the common range of the witness and
the defendant, but it did have one when the defendant took it
away.   Witness did not positively know how that notch in the
colt's ear was made, but thought it came about in this wise: The
colt was in bad condition, often got down, and witness frequently
helped it up.   Several times, while witness was working with
the colt while down, his shepherd dog took it by the head or ears,
and may, at some of those times, have torn the notch out; but, if
so, witness did not see it done, nor did he ever see blood on the colt's

ears. Witness called defendant's attention to that notch when he started off with the colt, but defendant paid no attention to what witness said. The colt was not marked in the manner witness marked his horses. Witness had never cut off a horse's tail. The feelings of the witness towards the defendant were not unkind. On the contrary, he had exerted himself to cultivate the defendant's friendship.

Ned Lankford testified, for the State, that he lived with and near the witness Basey in the year 1884, and knew his three colts well, which he described exactly as Basey did. The colts disappeared some time in October, 1884. He never afterwards saw either the black or the gray colt, but in October, 1885, he went with Mr. Basey to the range near the defendant's house and recovered the bay colt. It was then in the defendant's brand, the letters LW. Its mane and tail still had traces of the shaving to which the witness and Basey had subjected it a year before. Witness could not be mistaken in the identity of the colt. It was unquestionably Basey's colt.

Gum Drake testified, for the State, that he lived near Basey in 1884, and knew that Basey owned three colts, which he described as did the witness Basey. Those colts disappeared in the winter of 1884. Two of them the witness never afterwards saw. He saw the bay colt which Basey afterwards recovered, in October, 1885, and while he was unwilling to swear positively that that colt was one of the three belonging to Basey, he felt morally certain that it was.

Miss Ida McMorris, near whose father's house the prosecuting witness Basey lived in 1884, testified, for the State, in substance, that she knew the three colts which Basey owned in 1884. She had often petted and watered those colts. She described them exactly as they were described by previous witnesses. The three colts disappeared late in October, 1884. She had never seen the black and the iron gray colt since. Subsequent to October, 1885, she saw the bay colt recovered by Basey. That bay colt was one of the three which strayed from him a year or more before. Witness could not be mistaken in the identity of that animal. She knew it well, and was positive that it was Basey's colt.

B. M. *alias* Bud Kiker testified, for the State, that he lived about one and one-half miles from the defendant, and a mile from Mr. Fair's house. Parson Morton, the father of the witness Powers Morton, lived in the same neighborhood. Fair's house was situated on the defendant's cattle range. Witness,

during the fall and winter of 1884, occasionally noticed three mare colts, answering the description of those given by the prosecuting witness Basey, running about his, witness's, place. Witness did not observe them closely, as he supposed them to belong to the defendant. After these animals took up with Mr. Fair's horses, he, Fair, asked witness who owned them, and witness told him that he supposed they belonged to the defendant.

Mrs. Michael Fair testified, for the State, that in the early part of the winter of 1884, two mare colts came to her husband's place. One was a bay animal with a white spot in its forehead. The other was a small dirty mouse colored animal. Those animals were both very gentle. The little mouse colored or gray colt disappeared early in the winter of 1884, since when the witness had not seen it. The bay colt was in very bad condition, and often, when it got down, had to be helped up. That colt was taken away from the range in the spring of 1885. During the time that the bay colt ran on the range about the house of the witness's husband, witness often saw defendant riding over the range. He generally passed the house of Michael Fair, and some times stopped.

Thomas B. King testified, for the State, that he represented Basey on the trial of the civil suit involving the right of property in the colt. Defendant's suit was based on an account against Basey "for one horse of the value of twenty-five dollars." The account remained in that shape through three or four terms of the justice's court, when W. H. Devine, defendant's attorney in that case, with the witness's consent, changed the account to a demand for a mare instead of a horse. Devine told witness that the mistake was his and not defendant's. The State closed.

Andrew Hill was the first witness for the defense. He testified that he sold the defendant the old sorrel mare know as "Old Mollie," which the defendant owned in 1883. Witness knew "Old Mollie's" 1883 colt from the time it was ten days old until October, 1884, after which he saw nothing of it until he saw it in the possession of Basey. Witness recognized the colt Basey had in October, 1885, as "Old Mollie's" 1883 colt. Witness knew the colt's sire, known as "Old Thirty Horse." The colt resembled "Old Thirty Horse" in color, and "Old Mollie" in form. The colt witness saw in Basey's possession after the trial of the civil suit, was a bay mare with a white star in its forehead. Its head and long body resembled those features of "Old Mollie." Witness,

in the fall of 1885, went, at the request of the defendant, to Basey's house, and examined the colt involved in the prosecu· tion, and identified it at once as " Old Mollie's " 1883 colt.

Cross-examined, witness stated that in 1883 he and his family lived in Stephenville, but witness then owned a farm at Paluxy, two and a half or three miles distant from the defendant's house, and spent most of his time on it.   Witness had seen, but was unable to describe the colt " Old Mollie " gave birth to in 1884.

Jim Owens, the defendant's son, testified, in his behalf, that in May, 1885, his father sent for him to verify the identity of " Old Mollie's " 1883 colt, the animal involved in this prosecution. . That colt had strayed from the range in October, 1884.   Witness recognized the colt as " Old Mollie's " foal as soon as he got within fifty yards of it, and assured his father that the colt was, beyond all question, the 1883 foal of " Old Mollie.   It was a bay mare colt with a white spot in its forehead.

Cross-examined, witness said that the colt was branded on the day after the recovery.   Witness knew it from its birth until it was two years old, and could not be mistaken in its identity.   It had been gone several months when witness's father called him to the pen to identify it.   Witness had seen it on the range, off and on, from its birth, in 1883, until a little before or a little after Christmas, 1884.   From about Christmas, 1884, until May, 1885, when he saw it in the pen, witness saw nothing of it.   Witness some times rode over the range during the winter of 1884 and 1885.   The colt's tail was not cut off in the winter of 1884, when witness saw it.   It was not cut off when he last saw it, in 1884, about Christmas.   It was never in company with a belled black and a smutty gray colt.   When defendant called witness to identify the colt, he asked witness if he would know " Old Mollie's " 1883 colt.   Witness answered: " Yes; don't you know it !"   Defendant replied that he thought he did, but would not brand an animal about which there was any question.

Tom Owens, the defendant's younger son, testified, in his behalf, that he knew " Old Mollie's " 1883 colt perfectly well, and that the animal his father drove from Fair's, and which Basey afterwards took, was " Old Mollie's " 1883 foal.

Cross-examined, witness said that during the spring and summer of 1883 he went to school at Center Grove.   His sister Vade went to the same school at the same time, and he and Vade rode " Old Mollie."   The colt in question was a suckling then, and followed " Old Mollie."   Witness knew Powers Morton, who at-

tended the Center school, and denied that he ever told Powers Morton that "Old Mollie's" colt of 1883 was dead, and that defendant reported finding its body in a mud hole.

Vade Owens, daughter of the defendant, testified in his behalf, that she knew "Old Mollie's" colt of 1883. That colt disappeared in the fall of 1884. Witness afterwards saw it in possession of the prosecuting witness Basey. The colt involved in this prosecution was the identical colt that followed "Old Mollie" in 1883.

George Morton testified, for the defense, that he was a brother of the State's witness Powers Morton. The witness knew a bay mare colt, with a white star in the forehead, and a small smutty gray or mouse colored colt, which belonged to the defendant. In the winter of 1884–1885 the two colts described ran about the house of the witness's father with other animals belonging to the defendant. The small gray colt is still on the range.

B. H. Oxford testified, for the defense, that in the spring of 1883, the defendant brought the mare known as "Old Mollie" to his house, and called his attention to a bay yearling colt then following her. That colt resembled the mare and "Old Thirty Horse," a stallion owned by witness's brother, George Oxford. After the trial of the civil suit in the justice's court, witness saw a bay colt which resembled the colt defendant had with "Old Mollie" at his house in 1883.

W. H. Basey was placed upon the stand by the defense, and testified that he never gave George Morton a written description of the missing colts. He had never told George Morton that he would not know those colts if he saw them. He did tell him that he might not know the iron gray, but would know the other two any where. Witness gave Joe Witherspoon a written description of the colts, as follows: "A black or dark iron gray; a bay with a spot in its forehead, and a dark gray or mouse colored."

Joe Witherspoon testified, for the defense, that Basey gave him a written description of three colts. Witness had lost that writing, but remembered the description as two dark brown or black colts and a bay one. He said one of the black ones may have shed to an iron gray. In April, 1885, witness saw such colts on Buck creek, and sent word to Basey.

Mr. Turnbrough testified that it would take about a year for the hair on a colt's tail to grow out after being shaved.

A dozen or more witnesses testified that the defendant's reputation for honesty had always, prior to the return of the indictment in this case, been good. The defense closed.

Powers Morton testified, for the State, in rebuttal, that he never saw "Old Mollie's" 1883 colt after the spring of 1884. Late in the summer or early in the fall of 1884, the witness met Tom Owens, the defendant's son, on the defendant's stock range, and asked him where "Old Mollie's" 1883 colt was. Tom replied that it was dead; that his father reported finding its dead body in a mud hole on Dry branch. "Old Mollie's" 1884 colt was a sorrel horse colt, and resembled the 1883 colt except in sex and its white face. The streak down the 1884 colt's face covered the nose without a break, whereas the streak down the face of the 1883 mare colt stopped short of the snip on the nose. "Old Mollie's" 1883 colt was not on the range after the spring of 1884, and never ran with the three stray colts or any of them. It did not resemble the bay mare colt claimed by Basey.

Ned Lankford testified, for the State, that two or three months prior to this trial, he went to Joe Witherspoon's house and told him that he had been sent by Basey to say that he, Basey, had heard that he, Witherspoon, claimed that Basey's three colts were still on the range, and that he, Basey, would give him one of the colts to point the others out to witness. Witherspoon neither pointed them out nor attempted to do so.

J. G. Wofford testified, for the State, that he was present when Basey gave Sam Jackson a written description of the three colts he had lost, and he took a copy of the same in his memorandum book. Witness produced the memorandum book and read as follows: "One bay with spot in forehead, one dark brown or black, and one smutty gray, all fillies, and unbranded; the black and bay with manes and tails cropped off."

Bob Croft testified, for the State, that some time after the controversy over this colt arose between Basey and defendant, he heard the defendant say that a man in Stephenville saw Basey give Wofford a written description of the colts, at the time of the trial of the civil case, and that if Wofford denied that fact, he, Wofford, would get a whipping.

John Drake testified, for the State, that he was present, and heard Lankford offer Witherspoon, upon Basey's authorization, one of the colts to show the others on the range. Witherspoon made no effort to show the animals. The bay mare colt branded LW—the one involved in this prosecution—belonged to Basey in 1883 and 1884.

The motion for new trial raised the questions discussed in the opinion.

---

---

*Frank & Devine*, for the appellant.

*J. H. Burts*, Assistant Attorney General for the State.

WILLSON, JUDGE. After a careful consideration of the voluminous record in this case, our conclusion is that this prosecution involves nothing more than the trial of the right of property to a certain colt. It very clearly appears that defendant owned a colt which resembled the one in controversy. It is equally clear that Basey owned a similar colt. On the part of the State there is positive testimony that the colt in controversy was the property of Basey. On the other hand, defendant proved as positively that the colt was his property. As to the ownership of the colt, therefore, the evidence is conflicting, and upon this point we would not disturb the verdict of the jury.

But there can be no theft unless a fraudulent intent is shown to have existed in the mind of the accused, at the time of the taking. Thus, in this case, although the colt may in fact have been the property of Basey, and taken by the defendant without the consent of Basey, still such taking would not be theft, unless the evidence shows a fraudulent intent on the part of defendant, accompanying the act of taking. We think the evidence in this case fails to show such intent. It impresses us with the conclusion that the defendant took the colt believing that it was his property, and that he had good reasons for so believing. To our minds the usual *indicia* of theft are wholly wanting in this case. There was no concealment, or attempt at concealment. The colt was taken openly, under a claim of title thereto, and when Basey claimed the colt the defendant persisted in his claim thereto, and proposed to submit the question of the right to the colt to arbitration, which proposition Basey declined. We are clearly of the opinion that the evidence does not show a fraudulent intent accompanying the act of taking, and that therefore the conviction is not sustained by the proof. The court erred in not granting defendant a new trial because of the insufficiency of the evidence, and for this error the judgment is reversed and the cause is remanded.

Other errors assigned are not noticed in this opinion, because they are of a character not likely to occur on another trial.

*Reversed and remanded.*